IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
|    Plaintiff/Respondent, | § | |
| | § | |
| V. | § | CR. No. C-03-52 (3) |
| | § | C.A. No. C-05-490 |
| JULIETTA LEZA, | § | |
| | § | |
|    Defendant/Movant. | § | |

## ORDER SETTING EVIDENTIARY HEARING

Pending before the Court is Julietta Leza's ("Leza") motion to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255, (D.E. 168),[1] which was filed by and through counsel. The government filed its response and a motion to strike on December 4, 2006, and also asks therein that the Court dismiss the § 2255 motion. (D.E. 176.) Leza filed a reply on December 29, 2006, and the Court has also considered it. (D.E. 178.)

For the reasons set forth below, the Court orders an evidentiary hearing to address Leza's motion. The Court also DENIES the government's motion to strike.

## I. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 2255.

## II. FACTUAL BACKGROUND AND PROCEEDINGS

**A.   SUMMARY OF OFFENSE[2]**

Leza was a distributor and transporter in a marijuana and cocaine trafficking organization operating out of the Corpus Christi, Texas, area. The organization distributed drugs to Massachusetts,

---

[1] Docket entries refer to the criminal case.

[2] The facts of the offense are from the Presentence Investigation Report ("PSR") at ¶¶ 3-10.

Pennsylvania, Virginia, Georgia, Ohio, and Colorado from 1993 until 2002. Over the course of the conspiracy, the organization was responsible for transporting 3,066 kilograms of marijuana and 2795.5 kilograms of cocaine. The portions of the conspiracy involving Leza are set forth in more detail below.

In July 2000, Richard Gutierrez met Dermell Kendall Lewis from New Orleans and Elijah from Houston. Leza, who Gutierrez was dating at the time, advised Gutierrez that she would be able to supply him with marijuana and cocaine for his source in New Orleans, Lewis. From July 2000 to February 2001, Gutierrez received approximately 681 kilograms of marijuana and 257 kilograms of cocaine from Leza, which he sold to Lewis.

Before getting into the drug business with Leza and Lewis, Gutierrez was in the business of raising and fighting game roosters and had met George Puebla while fighting roosters in Vinton, Louisiana. In April 2001, Gutierrez was approached by Puebla at a rooster fight in Ricardo, Texas. Puebla asked Gutierrez if he was the individual from Houston that was receiving drugs from Leza. Puebla advised that his brother-in-law Felipe Alvarez,[3] was Leza's source. The following day, Gutierrez met with Alvarez, who sold Gutierrez 65 kilograms of cocaine. Puebla transported the cocaine to Gutierrez 's residence in Houston. On April 12, 2001, Elijah picked up the cocaine to be delivered to Lewis in Louisiana. Elijah was arrested by the DEA, however, and Gutierrez was subsequently arrested on April 12, 2001.

On April 23, 2001, Richard Garcia was arrested at the Falfurrias checkpoint in possession of 164 kilograms of cocaine, while driving a 1991 Peterbilt registered to Alvarez. Investigation revealed communications between Leza and Garcia, as well as between Leza and Gutierrez , Diana

---

[3] The PSR describes Alvarez as the leader of the organization. (PSR at ¶ 3.)

Alvarez and Grace Ann Puebla. (It was determined by DEA agents that George Puebla and Felipe Alvarez used telephone numbers subscribed to by family members to maintain contact with individuals in the drug trafficking organization.)

Rodney Mirabel reported that he met Alvarez in 1998. At the end of 1998 or beginning of 1999, Mirabel, Frank Fister and Alvarez met in Colorado. They decided that Mirabel would go straight to Alvarez to pick up cocaine and marijuana and would deliver it to Fister. (Mirabel had previously been working for John Valdez in moving the drugs from Alvarez to Fister, so this decision essentially cut Valdez out of the network.) As time went on, Fister became mainly interested in cocaine. Alvarez was able to supply some cocaine, but later developed a better supply of cocaine, Leza. In late 1999 or early 2000, Mirabel met Leza through Alvarez. Alvarez advised that Leza was the person he was working with to obtain cocaine from Mexico. Mirabel transported about 30 loads from Alvarez and Leza by car and plane. Specifically, Mirabel would fly to Dallas, San Antonio or Austin, rent a car and drive to Alvarez's ranch to pick up a load, and then return to the airport and fly the load out.[4] Of these 30 loads, seventeen were marijuana and ten were cocaine or a mixture of the two drugs.

Once the loads started going over 50 kilograms and Mirabel was unable to pack them in two suitcases, Fister asked his driver to drive a tractor trailer to Texas. Most of these transactions happened in Dallas, but some took place in Houston. On three or four of the transactions, Leza was with Alvarez when Mirabel delivered large sums of money to Alvarez. Leza helped count the bundles of ten thousand dollars and participated in conversations during which prices for the cocaine were being discussed.

---

[4] Mirabel worked for an airline and had a level of security clearance that allowed him to fly standby without having his two suitcases checked or inspected, as long as each suitcase was under 65 pounds.

3

During trial, Mirabel testified in detail how he obtained approximately 1,700 kilograms of cocaine from Alvarez, and further testified that Alvarez had advised him that Leza was his source for cocaine.

**B.   CRIMINAL PROCEEDINGS**

On February 20, 2003, Leza was charged (along with Alvarez, George Puebla and Diana Puebla Alvarez) in a three-count indictment.  (D.E. 1.)  Count One charged Leza with conspiracy to possess with intent to distribute more than 5 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.  Count Two charged Leza with possession with intent to distribute approximately 164 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), based on the load seized from Richard Garcia on April 23, 2001.  Count Three charged Leza with possession with intent to distribute approximately 65 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), based on the load sold to Gutierrez in April 2001.  (D.E. 1.)

Leza pleaded not guilty, and was tried before a jury on August 4 and 5, 2003.  (D.E. 98-108.) The jury returned a guilty verdict as to Count One, but acquitted Leza on Counts Two and Three.  (D.E. 102, 108.)  Leza was represented from her arraignment through trial and sentencing by retained counsel, Robert A. Berg.

Sentencing occurred on October 23, 2003.  The PSR held Leza accountable for 1,929 kilograms of cocaine, resulting in a base offense level of 38.  (PSR at ¶ 16.)  The PSR made no adjustments or enhancements to the offense level.  (PSR at ¶¶ 16-25.)  Leza had 0 criminal history points, and thus her criminal history category was I.  (PSR at ¶¶ 26-28.)  The resulting guideline range was 235 to 293 months, and the offense carried a minimum term of imprisonment of 10 years, and a maximum term of life imprisonment.  (PSR at ¶ 42-43.)

At sentencing, Leza's counsel argued that she should be entitled to a reduction for a minimal or minor role in the offense, that she should receive a three-level adjustment for acceptance of responsibility, and that she should receive safety valve relief.  (D.E. 147, Partial Sentencing Transcript ("Partial S. Tr.") at 6.)  After hearing testimony from the case agent and arguments from counsel, the Court overruled the objections as to minor role and acceptance, but agreed with the case agent and the government that Leza was entitled to safety valve relief based on her debriefings after trial. (D.E. 148, Sealed Sentencing Transcript ("Sealed S. Tr.") at 31-40.)  This reduced her offense level to 36 and resulted in a guideline range of 188 to 235 months.  (Sealed S. Tr. at 40.)

The Court sentenced Leza to 188 months in the custody of the Bureau of Prisons, to be followed by a four-year supervised release term, and imposed a $100 special assessment.  The Court also confirmed its earlier $5,000 forfeiture order.  (Sealed S. Tr. at 42; D.E. 133.)  Judgment was entered on October 30, 2003. (D.E. 133.)

Leza timely appealed (D.E. 134.)   On appeal, Leza argued that three statements were erroneously admitted at trial as exceptions to hearsay under the co-conspirator exception, because there was insufficient evidence to establish her participation in a conspiracy or to establish that the comments were made in furtherance of the conspiracy.  (D.E. 161 at 1.)  She also claimed that this Court erred in calculating the drug quantity for the base offense level and in denying her a minor role reduction, relying on Blakely v. Washington, 542 U.S. 296 (2004).  The Fifth Circuit affirmed the judgment of this Court in a per curiam opinion issued on December 22, 2004.  (D.E. 161.)  Leza then filed a petition for writ of certiorari, which the Supreme Court denied on October 3, 2005.  (D.E. 164.)

Leza filed the instant motion pursuant to 28 U.S.C. § 2255 on October 2, 2006.  It is timely.

### III. MOVANT'S ALLEGATIONS

Leza's motion asserts a single ground for relief. Specifically, she claims that she was denied effective assistance of counsel because her counsel, Robert Berg, advised her that if she went to trial, the maximum sentence that she faced would be seven years, and that she could receive a sentence of two to three years. In connection with this claim, she alleges that Berg failed to tell her that each of the charges against her carried a ten-year mandatory minimum. Leza further alleges that, had she known that her true sentencing exposure was in excess of fifteen years, she never would have proceeded to trial and instead would have pleaded guilty.

### IV. DISCUSSION

**A.   Motion to Strike**

As an initial matter, the Court notes that the government has moved to strike Leza's motion and claim on the grounds that it was not sworn to by her. Leza has since mooted this issue by providing a sworn statement adopting the factual statements in the initial § 2255 motion and adding additional detail. Accordingly, the government's motion to strike (D.E. 176) is DENIED.

**B.   Leza's § 2255 Motion**

Leza's claim is properly analyzed under the two-prong analysis set forth in Strickland v. Washington, 466 U.S. 668 (1984). United States v. Willis, 273 F.3d 592, 598 (5th Cir. 2001). To prevail on a claim of ineffective assistance of counsel, a movant must demonstrate that his counsel's performance was both deficient and prejudicial. Id. This means that a movant must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence. United States v. Dovalina, 262 F.3d 472, 474-75 (5th Cir. 2001).

If the movant fails to prove one prong, it is not necessary to analyze the other. Armstead v. Scott, 37 F.3d 202, 210 (5th Cir. 1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one"), cert. denied, 514 U.S. 1071 (1995); Carter v. Johnson, 131 F.3d 452, 463 (5th Cir. 1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.").

As noted, Leza claims that her attorney failed to inform her of her true sentencing exposure, but instead told her the maximum she would receive if she lost after trial was a seven-year sentence, and that she could possibly receive less. She also alleges that Berg made the statement in the presence of her mother, although she has not provided an affidavit from her mother. Additionally, she claims not to have known of the ten-year mandatory minimum for each count.

In addressing her claim, the Court is guided by the Fifth Circuit's decision in United States v. Grammas, 376 F.3d 433 (5th Cir. 2004), wherein the appellate court held:

> Failing to properly advise the defendant of the maximum sentence that he could receive falls below the objective standard required by Strickland. When the defendant lacks a full understanding of the risks of going to trial, he is unable to make an intelligent choice of whether to accept a plea or take his chances in court. ... By grossly underestimating [the defendant's] sentencing exposure ..., [counsel] breache[s] his duty as a defense lawyer in a criminal case to advise his client fully on whether a particular plea to a charge appears desirable.

Grammas, 376 F.3d at 436-37 (internal citations omitted) (alterations in original).

To show prejudice in such a case, the defendant must demonstrate that, absent his counsel's deficiencies, he would have pleaded guilty, and that there was a reasonable probability that he would have received a lesser sentence. See, e.g., Grammas, 376 F.3d at 438-39 (it was a question of fact whether the defendant would have pleaded guilty had he been properly counseled as to his potential punishment and received a lesser sentence); United States v. Herrera, 412 F.3d 577, 582 (5th Cir.

2005) (noting that the evidentiary hearing would assist the district court in determining whether the defendant relied on his attorney's alleged misrepresentations in rejecting the government's plea offer).

In responding to Leza's § 2255 motion, the government makes two primary arguments. First, it argues that Leza knew of the mandatory statutory minimum on each of her counts, and thus that the record does not support her claim. It relies for support on the transcript of the arraignment, during which United States Magistrate Judge Cooper-Hill advised Leza that each count of the indictment carried a ten-year mandatory minimum. (D.E. 179, Arraignment Transcript at 4.) Leza testified at that time that she understood. (Id.)

In response to this argument, Leza avers that she does not recall what she was told at her arraignment, but argues that what she relied upon was *her counsel's* estimates of her likely sentence. (D.E. 178, Exhibit A, Leza Decl. at 1.) She states: "I do not remember the magistrate judge telling me about my sentencing range or the mandatory minimum sentences when I was initially arraigned. I listened to and relied on Berg's advice about what my sentence might be if I went to trial. I trusted my lawyer to tell me what the consequences would be if I were to decide to go to trial or take a plea offer." (Id.)

The government's second argument is that, assuming arguendo that Berg did misadvise Leza (which he disputes in his own affidavit), her claim still fails because she cannot show that, absent her counsel's constitutionally deficient advice, she would have pleaded guilty instead of going to trial. (D.E. 176 at 25-27.) The government also argues that she cannot show prejudice because her sentence would not have been below the mandatory minimum, in any event, even if she had pleaded guilty. (D.E. 176 at 23-27.) This argument is unconvincing, because Leza complains not only of a failure to explain the mandatory minimums, but also of her counsel's alleged statements regarding a seven-year or lesser sentence if she went to trial. If such advice was given, it would not have been unreasonable

for her to reject the plea agreement, particularly if she thought she could prevail at trial. Moreover, there is certainly a reasonable possibility that, had she pleaded guilty, she would have received a lesser sentence than she in fact received.[5]

In this case, the Court cannot determine on the basis of the current record whether Berg was deficient in advising Leza about her sentencing exposure. On the one hand, Leza has provided sworn testimony that Berg told her, if she went to trial, that she could expect a maximum sentence of seven years, but that she could receive as little as two or three years. (D.E. 178 at Exhibit A, Leza Decl. at 1.) She further avers: "Berg never told me that if I were found guilty I would likely be sentenced to over 15 years or possibly for life." (Id.) Berg, on the other hand, testifies that he informed Leza of the statutory mandatory minimum sentence in her case, and that, if she went to trial, he expected her guidelines to be "in excess of fifteen years, with, in the worst case, a possibility of a life sentence." (D.E. 176, Berg Aff. at 1.)

Similarly, the Court cannot determine on the basis of the current record whether Leza can establish prejudice, i.e., that she would have proceeded to trial had she been correctly advised. Again, Leza states that Berg told her that her case was very defensible at trial and that her chance of winning were "good." (D.E. 178 at Exhibit A, Leza Decl. at 1.) She further avers that Berg told her that the government had "no evidence" against her. (Id.) She claims: "If I knew a life sentence were

---

[5] According to the affidavit of the prosecuting Assistant United States Attorney, Jon Muschenheim, the plea agreement offered to Leza was that, in return for her plea of guilty and truthful testimony at the time of rearraignment and sentencing, the government would recommend a three-level credit for acceptance of responsibility, a minor role adjustment under the guidelines and a sentence at the lowest end of the applicable guidelines. Thus, if Leza had pleaded guilty, she might have received a lesser sentence. Even if the Court rejected the government's recommendation of the minor role adjustment (just as it rejected the minor role request from Leza's counsel at sentencing), she could have received some credit for acceptance of responsibility, resulting in a lower guideline range. See Grammas, 376 F.3d at 439 n.5. Thus, there is the potential that Leza suffered prejudice.

9

a possibility I would have taken the plea offer without any hesitation." (Id.)

Berg paints a different picture. In his affidavit, he testifies that Leza refused to take any action, such as a plea, that "would almost certainly result in her separation from her children." (D.E. 176, Berg Aff. at 1.) He further explains:

> I was never able to set the separation issue aside as an obstacle to plea negotiations. Of course, the government made a written plea offer which I explained to Ms. Leza thoroughly and urged her to consider with great care. I was compelled to advise the government that it was rejected. It might be that the rejection was as much a result of the onerous forfeiture provisions as the separation issue.

(D.E. 176, Berg Aff. at 1-2.)

Thus, there are conflicts in the evidence on both issues that the Court must determine to rule on Leza's claim: i.e., (1) whether she was misadvised; and (2) if so, if she suffered prejudice because she would have otherwise proceeded to trial and probably received a lesser sentence. Because the Court cannot determine on the basis of the current record whether Leza can show either deficiency or prejudice, the Court must hold an evidentiary hearing to resolve these issues. See Rule 8, RULES GOVERNING SECTION 2255 PROCEEDINGS FOR THE UNITED STATES DISTRICT COURTS; see also Herrera, 412 F.3d 577 (remanding § 2255 motion for evidentiary hearing before the district court where the record was unclear as to whether attorney improperly advised defendant of his maximum sentencing exposure).

## V. CONCLUSION

For the foregoing reasons, the Court will hold an evidentiary hearing on Leza's § 2255 motion. **The evidentiary hearing is set for 9 a.m. on April 27, 2007.**

Leza is entitled to be represented by counsel at the hearing. See Rules Governing Section 2255 Motions 8(c). Because she already is represented by retained counsel in these proceedings, it

is not necessary to appoint new counsel for her.

    Finally, the government's motion to strike (D.E. 176) is DENIED.

    It is so ORDERED this 8th day of February 2007.

                                                     _____
                                                       Janis Graham Jack
                                                       United States District Judge